**AUSIMONT USA, INC. and Ausimont Spa, Plaintiffs,**

v.

**The UNITED STATES, Defendant,**

and

**E.I. Du Pont de Nemours & Co., Inc., Defendant–Intervenor.**

**Slip Op. 95–15.
Court No. 93–05–00282.**

United States Court of International Trade.

Decided: Feb. 1, 1995.

Steptoe & Johnson, Washington, DC (Daniel J. Plaine, Robert T. Novick, Mark A. Barnett, Gary L. Goldsholle), for plaintiffs Ausimont USA Inc. and Ausimont SpA.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, (Michael S. Kane), of counsel: J.C. Lowe, Import Admin., U.S. Dept. of Commerce, Washington, DC, for defendant.

Wilmer, Cutler & Pickering, Washington, DC (John D. Greenwald, Ronald I. Meltzer), for defendant-intervenor E.I. Du Pont de Nemours & Co., Inc.

## OPINION

MUSGRAVE, Judge.

In this action, plaintiffs Ausimont SpA and Ausimont USA (collectively "Ausimont") have contested the final affirmative anti-circumvention determination by the International Trade Administration, U.S. Department of Commerce ("ITA" the "Department" or "Commerce"): *Granular Polytetrafluoroethylene Resin From Italy; Final Affirmative Determination of Circumvention of Antidumping Duty Order,* 58 Fed.Reg. 26,100 (April 30, 1993). Ausimont argues that the ITA committed reversible error in finding that Ausimont's imports of polytetrafluoroethylene ("PTFE") wet raw polymer from Italy circumvented the outstanding antidumping order against granular PTFE resin.

### *Background[1]*

Ausimont produces a broad array of fluoropolymer and other chemical products, including granular PTFE resin. Ausimont USA operates production facilities in Thorofare, New Jersey and Orange, Texas. Ausimont SpA also operates production facilities in Spinetta, Italy. In its Texas facility, Ausimont processes PTFE wet raw polymer into other products, including granular PTFE resin and lubricant powder. *Memorandum In Support of Plaintiffs' Motion For Judgment Upon the Agency Record ("Plaintiffs' Memorandum"),* at 3.

On June 21, 1991, E.I. Du Pont de Nemours ("Du Pont") petitioned the ITA to conduct an inquiry into whether imports of "PTFE wet raw polymer" were within the scope of the antidumping duty order on finished granular PTFE resin from Italy. *See Antidumping Duty Order; Granular Polytetrafluoroethylene Resin From Italy,* 53 Fed.Reg. 33,163 (August 30, 1988) ("*Order*"). On October 15, 1991, Du Pont revised its

---

1. The administrative record filed with the Court is contained on 28 separate microfiches. Documents are identified by their respective fiche and frame numbers: "C.R. Document ——, Fi. ——, Fr. ——" for proprietary documents and "P.R. Document ——, Fi. ——, Fr. ——" for public documents.

petition to request that the ITA conduct an anti-circumvention inquiry pursuant to 19 U.S.C. § 1677j(a) (1988). C.R. Document 2, Fi. 17, Fr. 25. 19 U.S.C. § 1677j(a) provides in relevant part:

**(a) Merchandise completed or assembled in the United States**

**(1) In general**

If—

(A) merchandise sold in the United States is of the same class or kind as any other merchandise that is the subject of—

(i) an antidumping duty order issued under section 1673e. . . .

(B) such merchandise sold in the United States is completed or assembled . . . from parts or components produced in the foreign country with respect to which such order or finding applies, and

(C) the difference between the value of such merchandise sold in the United States and the value of the imported parts and components referred to in subparagraph (B) is small,

the administering authority . . . may include within the scope of such order or finding the imported parts or components referred to in subparagraph (B) that are used in the completion or assembly of the merchandise in the United States at any time such order or finding is in effect.

**(2) Factors to consider**

In determining whether to include parts or components—in a[n] . . . antidumping duty order or finding under paragraph (1), the administering authority shall take into account such factors as—

(A) the pattern of trade,

(B) whether the manufacturer . . . of the parts or components is related to the person who assembles or completes the merchandise sold in the United States . . ., and

(C) whether imports into the United States of the parts or components . . . have increased after the issuance of such order or finding.

On November 18, 1991, pursuant to Du Pont's request and 19 U.S.C. § 1677j(a), the ITA initiated an anti-circumvention investigation to determine whether Ausimont was circumventing the *Order* by importing PTFE wet raw polymer from Italy for completion or assembly into granular PTFE resin in the United States. 56 Fed.Reg. 64,588 (1991), P.R. Document 4, Fi. 1, Fr. 36; P.R. Document 5, Fi. 1, Fr. 40.

### A. *Preliminary Determination*

The ITA issued Ausimont an initial questionnaire on December 2, 1991, requesting general information. P.R. Document 6, Fi. 1, Fr. 45. Ausimont responded on December 16, 1991 and January 21, 1992. C.R. Document 4, Fi. 17, 18, Fr. 30; C.R. Document 5, Fi. 18, Fr. 5. Subsequently, prior to the preliminary determination, the ITA issued Ausimont four more questionnaires,[2] and Ausimont provided the ITA with extensive sales and cost of production information.[3]

On August 31, 1992, the ITA issued its affirmative preliminary circumvention determination. *Granular Polytetrafluoroethylene Resin From Italy; Preliminary Affirmative Determination of Circumvention of Antidumping Duty Order,* 57 Fed.Reg. 43,218 (1992) ("*PTFE Preliminary*"). In the *PTFE Preliminary,* the ITA, applying the criteria set forth in 19 U.S.C. § 1677j(a)(1), found that the granular PTFE resin produced at Ausimont's Texas facility *was the same class or kind of merchandise* as the imported granular PTFE resin. In addition, the ITA determined that the granular PTFE resin produced in the United States was manufactured from PTFE wet raw polymer imported from Italy, whose resin is subject to the *Order. Id.; see* 19 U.S.C. § 1677j(a)(1)(B).

---

**2.** P.R. Document 10, Fi. 2, Fr. 30; P.R. Document 21, Fi. 7, Fr. 71; P.R. Document 23, Fi. 8, Fr. 63; C.R. Document 12, Fi. 25, Fr. 10.

**3.** *See* C.R. Document 6, Fi. 18–22, Fr. 79; C.R. Document 8, Fi. 22, Fr. 83; C.R. Document 9, Fi. 23, Fr. 1; C.R. Document 10, Fi. 24, Fr. 5; C.R. Document 13, Fi. 25, Fr. 15.

The ITA next attempted to determine whether the difference in value between the finished granular PTFE resin produced in the United States and the PTFE wet raw polymer imported from Italy was *small. See* 19 U.S.C. § 1677j(a)(1)(C). The ITA determined the value of the finished granular PTFE resin based upon its final *ex-factory selling price* [4] in the United States. *PTFE Preliminary*, 57 Fed.Reg. at 43,219. By contrast, the ITA was unable to rely upon market prices to determine the value of PTFE wet raw polymer because there is no market for such a product and Ausimont had not sold PTFE wet raw polymer to, or purchased it from, any unrelated party. *Id.* As a consequence, the ITA calculated a base value for the PTFE wet raw polymer using Ausimont's costs of production at Ausimont's Texas facility. *Id.* The ITA then adjusted this value downward by a deduction for losses calculated by multiplying Ausimont's general expenses and losses at its Texas facility by the ratio of the cost of production of the PTFE wet raw polymer to the total cost of the finished granular PTFE resin. *Id.; PTFE Preliminary—Preliminary Difference-In-Value Analysis Memo*, C.R. Document 14, Fi. 25, Fr. 60.

Applying this methodology, the ITA calculated an apparent difference in value of [——] percent. *Id.* The ITA, however, determined that this method significantly overstated the difference in value because the deduction for losses was artificially inflated as a result of the [_____] losses that Ausimont sustained at its Texas facility during the period of inquiry—losses that totaled approximately [——] percent of Ausimont's production costs. *Id.* The ITA contends that these losses were the inevitable result of the anomalous start-up cost, [_____] fixed costs, and [_____] capacity utilization at Ausimont's Texas facility. *Id.*[5] The impact of these [_____] losses upon the

difference in value calculation was to increase the apparent difference in value dramatically from the [——] percent figure that would have been obtained absent the deduction for losses at the Texas facility. *Id.* at Fr. 61; *PTFE Preliminary*, 57 Fed.Reg. at 43,319–20.

The ITA concluded that Ausimont's [_____] losses unreasonably "inflated" the difference in value between finished granular PTFE resin and PTFE wet raw polymer and, therefore, did "not provide a realistic measure of the true difference in value." *PTFE Preliminary*, 57 Fed.Reg. at 43,220. For this reason, the ITA determined that it was "both necessary and appropriate to place greater emphasis on" the other indicators of the difference in value between the granular PTFE resin and the PTFE wet raw polymer—*i.e.*, qualitative, descriptive factors. *Id.*

The ITA ascertained that in order to more accurately determine the value added by processing PTFE wet raw polymer into finished granular PTFE resin at Ausimont's Texas facility, it analyzed the operations performed at the Texas facility in the context of the "complete integrated production process for granular PTFE resin," as described in the International Trade Commission's ("ITC") original investigation and an encyclopedia of chemical technology. *Id.* (*citing ITC Final Determination*, USITC Pub. 2042, August 1988 at A–5 and Kirk–Othmer, 11 *Encyclopedia of Chemical Technology* 3 (1980)). The ITA described the process for manufacturing PTFE wet raw polymer as follows:

The process begins with the production of tetrafluoroethylene (TFE) monomer. Production of TFE monomer involves the production of hydrogen fluoride and chloroform, which are combined and converted to TFE monomer through a procedure known as pyrolysis. Because pyrolysis yields by-products that adversely affect TFE mono-

---

**4.** The ITA calculated the *ex-factory selling price* by deducting U.S. inland freight from the reported selling price. *PTFE Preliminary*, 57 Fed.Reg. at 43,219.

**5.** Specifically, Ausimont's Texas facility was designed to process [_____] million pounds of finished resin per year, or [_____] pounds between its opening in December 1990, and October,

1991, the end of the period of inquiry. *PTFE Preliminary—Preliminary Difference-In-Value Analysis Memo*, C.R. Document 14, Fi. 25, Fr. 60. The facility, however, processed only [_____] pounds during that period, or approximately [_____] of the anticipated capacity. *Id.* at Fr. 61.

mer polymerization, the TFE monomer must be purified using an extremely complex refinement process.

After purification, the TFE monomer, which is stored in liquid form, is subject to a process known as polymerization, which is also fairly complex. During this process, the TFE monomer is combined with an initiator and vigorously agitated to produce the solid raw polymer, which is the product being imported by Ausimont.

*Id.* (citations omitted).

The ITA stated that the only processing that Ausimont performs in the United States is the post-treatment cutting and drying of the PTFE wet raw polymer. *Id.* According to the ITA, Ausimont "does not add any additional materials to the PTFE wet raw polymer, nor does it alter in any way the chemical composition of PTFE wet raw polymer." *Id.*[6]

The ITA contrasted Ausimont's processing of PTFE wet raw polymer to the facts of other anti-circumvention investigations in which the value added during the completion of finished merchandise in the United States was found to be not small, in part, because respondents added numerous materials and performed a variety of complex operations to the imported components in the United States. *Id.* (*citing Portable Electric Typewriters From Japan: Negative Preliminary Determination of Circumvention of Antidumping Duty Order,* 56 Fed.Reg. 46,594, 46,596 (1991) ("*PETs Preliminary*"); *Certain Internal–Combustion Industrial Forklift Trucks From Japan; Negative Preliminary Determination of Circumvention of Antidumping Duty Order,* 54 Fed.Reg. 50,-260, 50,261, 50,282 ("*Forklifts Preliminary*") (1989)). The ITA also noted that in these other anti-circumvention investigations, United States production facilities comparable in scale to home market facilities, as well as respondents' significant investment in such facilities, had further demonstrated that the value added to imported components in these facilities was not small. *Id.* (*citing PETs Preliminary,* 56 Fed.Reg. 46,594, 46,596 (1991); *Forklifts Preliminary,* 54 Fed.Reg.

50,260, 50,261, 50,282 (1989)). The ITA concluded that it lacked such comparative information regarding Ausimont's United States production facility, but indicated that it would request this information prior to its final determination. *PTFE Preliminary,* 57 Fed.Reg. at 43,220–21. The ITA, however, made a preliminary determination that the value added by the processing of PTFE wet raw polymer into granular PTFE resin was small, thereby indicating that the difference in value between polymer and resin was small. *Id.*

The ITA next analyzed the market factors set forth in 19 U.S.C. § 1677j(a)(2). The ITA found that Ausimont SpA and its Texas-based subsidiary were related. *Id.* at 43,221. The ITA also found that (1) Ausimont had shifted its pattern of trade away from imports of finished granular PTFE resin in favor of imports of PTFE wet raw polymer, with an increase in polymer imports of nearly fourfold during the period of inquiry; (2) this shift corresponded to the commencement of operations at Ausimont's Texas facility in December, 1990 (after the issuance of the *Order* on granular PTFE resin); and (3) Ausimont imported PTFE wet raw polymer into the United States for the sole purpose of producing finished granular PTFE resin. *Id.* Combined with its finding that the difference in value between the PTFE wet raw polymer and the granular PTFE resin was small, the ITA determined that these market factors supported a preliminary affirmative determination of circumvention. *Id.*

**B.** *Final Affirmative Determination*

Subsequent to its preliminary determination, the ITA issued two more questionnaires requesting: (1) detailed descriptions of Ausimont's Italian production processes for PTFE wet raw polymer and granular PTFE resin; (2) data regarding the costs of Ausimont's finishing operations in Italy; (3) data regarding investment, employment, and output levels at Ausimont's Italian facility; and (4) production data from Ausimont's current Texas and former New Jersey facilities. P.R. Document 35, Fi. 10, Fr. 87; P.R. Docu-

---

**6.** The ITA explained that PTFE wet raw polymer has the same chemical characteristics and com-

position as granular PTFE resin. *PTFE Preliminary,* 57 Fed.Reg. at 43,220.

ment 48, Fi. 11, 12, Fr. 98. Ausimont responded on October 19 and November 13, 1992. C.R. Document 15, Fi. 25, 26, Fr. 70; C.R. Document 18, Fi. 26, Fr. 27.

The ITA issued its final affirmative anticircumvention determination on April 30, 1993. *Granular Polytetrafluoroethylene Resin From Italy; Final Affirmative Determination of Circumvention of Antidumping Duty Order,* 58 Fed.Reg. 26,100 (April 30, 1993) (*"PTFE Final Determination"*). The ITA compared per-unit costs for the processing performed in Ausimont's Texas facility to the per-unit costs for substantially similar processing performed in Ausimont's Italian facility. The ITA confirmed its preliminary determination that the [_____] losses incurred at the Texas facility were due to [_____] start-up costs and the fact that the Texas facility did not operate at full capacity. *Id.* at 28,101–04; *PTFE Final Determination—Final Difference–In–Value Analysis Memo,* C.R. Document 26, Fi. 28, Fr. 82. As a consequence, the ITA determined that the substantially similar costs of processing PTFE wet raw polymer into granular PTFE resin in Italy—*i.e.,* costs related to the post-treatment cutting and drying of the polymer—were a more accurate reflection of the actual costs than expenses incurred in the underutilized Texas facility. *PTFE Final Determination,* 58 Fed.Reg. at 20,202; *PTFE Final Determination—Final Difference–In–Value Analysis Memo,* C.R. Document 26, Fi. 28, Frs. 86–87.

As a result, in calculating the difference in value between the finished granular PTFE resin produced in the United States and the PTFE wet raw polymer imported from Italy for purposes of the final determination, the ITA determined a final *ex-factory selling price* for the finished granular PTFE resin in the United States and a base value for PTFE wet raw polymer representing the costs of production. *PTFE Final Determination,* 58 Fed.Reg. at 20,202. In contrast to the preliminary determination, however, the ITA calculated the deduction for losses using data from Ausimont's Italian operations instead of the data from Ausimont's Texas facility. The ITA determined that these calculations demonstrated that the difference in value between granular PTFE resin and PTFE wet raw polymer is only [——] percent. *PTFE Final Determination—Final Difference–In–Value Analysis Memo,* C.R. Document 26, Fi. 28, Fr. 91.

In addition, the ITA asserts that it confirmed its preliminary determination that the processing performed at Ausimont's Texas facility are "relatively simple" finishing operations "that constitute only a slight change in methods of production or shipment." *PTFE Final Determination,* 58 Fed.Reg. at 28,103; *PTFE Final Determination—Final Difference–In–Value Analysis Memo,* C.R. Document 26, Fi. 28, Frs. 82–86. The ITA found that the operations that Ausimont performs in the United States represent only a fraction of the manufacturing process that Ausimont performs in Italy. Moreover, the ITA found that Ausimont's investment in its United States operations is relatively minor compared to the level of investment required to establish an integrated production facility. *PTFE Final Determination,* 58 Fed.Reg. at 20,102. On this basis, the ITA confirmed that the difference in value of [——] percent is small.

### Discussion

■ In reviewing injury, antidumping, and countervailing duty investigations and determinations, this Court must hold unlawful any determination unsupported by substantial evidence on the record or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1982). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (*quoting Consolidated Edison Co. of New York v. National Labor Relations Board,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). Substantial evidence supporting an agency determination must be based on the whole record. *See Universal Camera Corp.,* 340 U.S. at 488, 71 S.Ct. at 465. The "whole record" means that the Court must consider both sides of the record. It is not sufficient to examine merely the evidence that sustains the agency's conclusion. *Id.* In other

words, it is not enough that the evidence supporting the agency decision is "substantial" when considered by itself. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. *Id.* at 478, 488, 71 S.Ct. at 459, 465.

■■■ The interpretation of the laws administered by Commerce should be sustained if that interpretation is reasonable. *United States v. Zenith Radio Corp.,* 64 CCPA 130, C.A.D. 1195, 562 F.2d 1209 (1977), *aff'd,* 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978); *American Lamb Company v. United States,* 785 F.2d 994 (Fed.Cir.1986). Furthermore, this Court should not reject the interpretation of a statute or regulation administered by an agency unless it has compelling reasons to do so. *Wilson v. Turnage,* 791 F.2d 151, 155–56 (Fed.Cir.1986), *cert. denied,* 479 U.S. 988, 107 S.Ct. 580, 93 L.Ed.2d 583 (1986).

The Supreme Court has held, with regard to judicial review of an agency's construction of a statute it administers, that absent direct Congressional instruction as to the precise question at issue, the question for the Court to decide is whether the agency's interpretation is based upon a permissible construction of the statute. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Where the agency's interpretation of a statute represented a reasonable accommodation of manifestly competing interests, it was entitled to deference. *Id.* at 865, 104 S.Ct. at 2793. Since Commerce administers the trade laws and its implementing regulations, it is entitled to deference in its reasonable interpretations of those laws and regulations. *PPG Industries, Inc. v. United States,* 13 CIT 297, 299, 712 F.Supp. 195, 198 (1989), *aff'd,* 978 F.2d 1232 (Fed.Cir.1992).

This should not suggest the vacation of meaningful judicial review, but rather a recognition that administrative agencies must be permitted to effectively employ their administrative expertise in carrying out their legislative mandates. *Id.*

Ausimont argues that the ITA's interpretation and application of the "difference in value" provision of 19 U.S.C. § 1677j(a)(1)(C) were not in accordance with law in two respects. First, the ITA failed to base its determination of whether the difference in value was *small* on the 38–55 percent figure it calculated under its "customary" methodology. Second, the ITA erroneously introduced qualitative factors, which may properly be analyzed *only* under 19 U.S.C. § 1677j(a)(2), into its analysis of the difference in value in 19 U.S.C. § 1677j(a)(1)(C). *Plaintiffs' Memorandum,* at 11.

Ausimont contends that the ITA in its final determination recognized that the difference in value between imported PTFE wet raw polymer and the granular PTFE resin produced in Texas from the imported wet raw polymer was 38–55 percent. *Id.* at 11–12; *PTFE Final Determination,* 58 Fed.Reg. at 26,101. This result was calculated by the ITA using figures supplied by Ausimont's Texas and Italian facilities in the first five questionnaire responses and in accordance with the ITA's "customary" method of calculation.[7] *Plaintiffs' Memorandum,* at 12 n. 10 and 11. Ausimont asserts that neither the ITA nor the petitioners ever raised any questions as to the accuracy, completeness, correctness or verifiability of the figures used in this calculation. *Id.* at 13.

Ausimont asserts that despite the ITA's complete acceptance of the underlying figures and its recognition of the correct "customary" methodology used to calculate the

---

7. As recognized in the *PTFE Final Determination,* the ITA's calculation of the value of the PTFE wet raw polymer consists of: 1) calculating the profit or loss in the United States by deducting from the U.S. selling price of the granular PTFE resin produced in the United States both a) the processing costs and general expenses incurred in the United States and b) the relevant costs and expenses incurred in the home market; and 2) allocating a portion of the resulting profit or loss and a portion of the U.S.

general expenses to the cost of production of the PTFE wet raw polymer. *PTFE Final Determination,* 58 Fed.Reg. at 26,101.

Under the ITA's standard methodology, this value of PTFE wet raw polymer is to be deducted from the value of the granular PTFE resin produced in Texas to obtain the absolute difference in value. The resulting difference in value is then divided by the value of the granular PTFE resin to yield the relevant difference in value percentage. *Id.*

38–55 percent difference in value, the ITA refused to rely on it as the basis of either its preliminary or final determinations. *Id.* Ausimont argues that in the final determination the ITA committed error by adopting a methodology to calculate the difference in value which was neither suggested in its preliminary determination nor briefed by the parties. *Id.* at 14.

Relying on information Ausimont provided in two questionnaires issued after the preliminary determination, the ITA substituted the production costs of Ausimont's Italian facility in place of the production costs of Ausimont's Texas facility in the difference in value calculation. Because the capacity utilization was higher in Italy and the per-unit costs lower, the ITA concluded that Ausimont costs for converting imported PTFE wet raw polymer into granular PTFE resin at the Texas facility were unreliable and the costs incurred at Ausimont's Italian facility provided a more reasonable basis. Based upon that substitution, the ITA calculated a difference in value of 10–20 percent. *PTFE Final Determination*, 58 Fed.Reg. at 26,102. Ausimont argues that this is simply unacceptable under the statute and ITA practice. *Plaintiffs' Memorandum*, at 19 *et seq.* Ausimont argues that the plain language of the anti-circumvention statute provides that the ITA is to calculate the "difference between the value of such [product] sold in the United States and the value of the imported parts and components...." *See* 19 U.S.C. § 1677j(a)(1)(C). By defining one element of the difference in value calculation as "the value of [the] product sold in the United States," Congress contemplated that the ITA would base its determination on the costs incurred at the U.S. production facility to process the imported parts or components

into the finished product. *Plaintiffs' Memorandum*, at 20. Ausimont argues that this substituted data is simply not relevant to whether circumvention is occurring. Ausimont contends that the difference in value which is relevant to ITA's determination results from processing that occurred at the Texas facility. *Id.*

Furthermore, Ausimont argues that in addition to the statutory basis for rejecting the substitution of costs incurred at a different facility, the ITA itself has previously recognized factual reasons for declining to compare even investment levels at different facilities. *Id.* at 20–21; *See Certain Internal–Combustion, Industrial Forklift Trucks From Japan; Negative Final Determination of Circumvention of Antidumping Duty Order ("Forklifts Final Determination")*, 55 Fed.Reg. 6,028, 6,029 (1990) ("comparisons are inappropriate because they do not account for a variety of factors that affect investment levels, such as volume of production and types of products manufactured."). Ausimont asserts that the administrative record before this Court contains a wealth of information regarding the significance of the differences between the Ausimont USA and Ausimont SpA facilities. Among those differences are: 1) the production volumes and capacity for Ausimont SpA are significantly different from those of Ausimont USA;[8] 2) the Ausimont SpA facility produces a number of products in addition to granular PTFE resin whereas the Ausimont USA facility produces only two other products;[9] 3) Ausimont SpA facility is significantly depreciated whereas Ausimont USA operates a new, state-of-the-art system;[10] 4) Ausimont USA uses new, computer-controlled technology and processes, many of which differ from those used by Ausimont SpA;[11] 5) the two

**8.** *See* Ausimont's October 19, 1992 submission at 19 (P.R. Fi. 11, Fr. 69, C.R. Fi. 25, Fr. 94) (*Plaintiffs' Memorandum,* Attachment E) (*Ausimont SpA's production volumes*); Ausimont's May 18, 1992 submission at Ex. 5 (P.R. Fi. 9, Fr. 43, C.R. Fi. 24, Fr. 63) (*Plaintiffs' Memorandum,* Attachment F) (*Ausimont USA's production volumes*).

**9.** *See* Ausimont's October 19, 1992 submission at 15–16 (P.R. Fi. 11, Fr. 65–66, C.R. Fi. 25, Fr. 90–91) (*Plaintiffs' Memorandum,* Attachment G) (*products produced at Ausimont SpA's facility*);

Ausimont's January 21, 1992 submission at 3 (P.R. Fi. 2, Fr. 81, C.R. Fi. 18, Fr. 15) (*Plaintiffs' Memorandum,* Attachment H) (*products produced at Ausimont USA's facility*).

**10.** *See Ausimont's Rebuttal Brief* dated December 14, 1992 at 41, 48 (P.R. Fi. 12, Fr. 97, Fi. 13, Fr. 6, C.R. Fi. 28, Fr. 7, 14) (*Plaintiffs' Memorandum,* Attachment I)

**11.** *See* Ausimont's October 19, 1992 submission at Ex. 1 (P.R. Fi. 11, Fr. 73–76, C.R. Fi. 25, Fr.

companies operate under completely different government regulatory structures and myriad other factors which affect the operating costs of each plant (*e.g.* environmental controls, water purity, *etc.*).[12] *Plaintiffs' Memorandum,* at 22–23.

In addition, Ausimont argues that the statutory framework established by Congress requires that the ITA first determine whether the three prerequisite criteria have been established before considering other factors. Ausimont argues that the ITA's authority to consider qualitative factors is based on 19 U.S.C. § 1677j(a)(2), which permits the consideration of three factors "enumerated" therein, as well as additional "unenumerated" factors, *only* after the threshold criteria of 19 U.S.C. § 1677j(a)(1) have been established. *Id.* at 25. Essentially, Ausimont argues that the determination of whether the difference in value is *small* is a threshold inquiry that *must precede* any analysis of qualitative factors. Ausimont argues that the ITA failed to base either the preliminary or final determination on whether that numeric difference in value was small. Instead, in each case, the ITA improperly relied on its consideration of three qualitative factors [13] in addition to the numeric difference in value to determine whether the difference in value was small. *Id.* at 26.

Ausimont asserts that the arguments which will be made by the parties in this case are analogous to those made in *Smith Corona Corp. v. United States,* 17 CIT ——, 811 F.Supp. 692 (1993). *Plaintiffs' Memorandum,* at 9–10. In that case, the ITA understood that it was required to determine, as a threshold matter, whether the difference in value between the imported parts and components and goods sold in the United States

was small. *Only* if that difference in value was *small* did the ITA claim to have the discretion to include the parts and components in the antidumping order, subject to its evaluation of the factors set forth in 19 U.S.C. § 1677j(a)(2). Smith Corona (like the ITA in this case), argued that 19 U.S.C. § 1677j(a)(1) is a general clause and that the ITA is required to consider the factors in 19 U.S.C. § 1677j(a)(2) prior to making any determination. The Court in *Smith Corona Corp.,* found that the ITA's interpretation there comported with the plain meaning of the statute. The Court rejected Smith Corona's arguments based on congressional intent as meritless and irrelevant in light of the clear statutory language. *Smith Corona Corp.,* 17 CIT at ——, 811 F.Supp. at 694.

The ITA contends that Ausimont's arguments are without any support in the statute, the legislative history, or the case law. Absent from 19 U.S.C. § 1677j(a)(1)(C) is any definition of the terms "value" or "small." As the Senate Committee on Finance explained, this omission was intentional:

> The Committee has not attempted to develop a precise meaning for the term "small" as used in these sections, *principally in recognition that different cases present different factual situations.*

S.Rep. No. 71, 100th Cong., 1st Sess. 100 (1987) ("Senate Report") (emphasis added). Thus, the ITA argues that Congress recognizes what Ausimont does not: Commerce must be accorded substantial deference in determining whether the value added to imported "parts or components" in the United States is *small* within the meaning of 19 U.S.C. § 1677j(a)(1)(C) because the facts of circumvention vary from case to case. *De-*

---

98, Fi. 26, Fr. 1–3) (*Plaintiffs' Memorandum,* Attachment J) (*Ausimont USA's production process*); *Id.* at 10–14 (P.R. Fi. 12, Fr. 60–64, C.R. Fi. 25, Fr. 85–89) (*Plaintiffs' Memorandum,* Attachment K) (*Ausimont SpA's production process*).

**12.** *See Ausimont's Rebuttal Brief* dated December 14, 1992 at 48 (P.R. Fi. 13, Fr. 6, C.R. Fi. 28, Fr. 14) (*Plaintiffs' Memorandum,* Attachment I); Ausimont's October 19, 1992 submission at 10–14 and Ex. 1 (P.R. Fi. 12, Fr. 60–64, 73–76, C.R. Fi. 25, Fr. 85–89,, Fi. 26, Fr. 1–3) (*Plaintiffs' Memorandum,* Attachments J & K).

**13.** The ITA considered: 1) the nature of the processing performed in the United States compared with a fully-integrated facility for producing granular PTFE resin; 2) the extent of production facilities in the United States compared with the U.S. production facility previously operated by Ausimont USA; and 3) the level of investment by Ausimont USA in the Texas facility compared with the level of investment by Ausimont SpA in its Spinetta, Italy facility. *PTFE Final Determination,* 58 Fed.Reg. at 26,102.

*fendant's Memorandum In Opposition To Plaintiffs' Motion For Judgment Upon the Administrative Record ("Defendant's Memorandum in Opposition"),* at 23.

The ITA argues that rather than restricting Commerce to a specific methodology or type of analysis, Congress intended exactly the opposite:

> While these subsections grant [Commerce] *substantial discretion in interpreting these terms,* and involving these measures, as to allow it the *flexibility* to apply the provision in an appropriate manner, the Committee expects [Commerce] to use this authority to the fullest extent possible to combat diversion and circumvention of the antidumping and countervailing duty laws.

Senate Report at 100 (emphasis added). Essentially, the ITA argues that Congress has purposefully given Commerce substantial discretion to interpret the terms "small" and "value" and the "flexibility" to employ whatever methodologies and analytical techniques are reasonable and appropriate under the facts of a specific case. *Defendant's Memorandum in Opposition,* at 24.

The ITA argues that Ausimont's assertion that it did not offer a reasoned explanation for its alleged departure from past practice is incomprehensible in the face of the lengthy and comprehensive discussion of this issue contained in the final determination:

> *Because this is the first anti-circumvention inquiry in which we have encountered losses of the type and magnitude at issue, we have not had to evaluate the effect of respondents' profit or loss on our analysis in previous inquiries....* [W]e believe that we must consider the causes and the extent of a respondent's losses in reaching conclusions regarding the difference in value in an anti-circumvention inquiry. Otherwise, losses resulting from factors unrelated to the nature of the production process that is the subject of an anti-circumvention inquiry would distort our quantitative analysis by artificially inflating the calculated difference between the value of imported parts or components and the value of a finished product. This would prevent an accurate measure of the extent to which a production process con-

tributes to the difference in value and the extent to which a process represents a change in a respondent's method of production or shipment. In this context, it would be illogical to assume that Congress intended that the outcome of anti-circumvention inquiries should be determined by factors that are unrelated to the nature of the production process being evaluated. Therefore, it is both necessary and appropriate for us to determine the effect that such factors may have on our difference in value analysis and, when such factors distort our analysis, to use a method that more accurately reflects the nature of the production process that is the subject of the inquiry.

*PTFE Final Determination,* 58 Fed.Reg. at 26,104 (emphasis added).

The ITA argues that it made specific findings that Ausimont's "Italian facility is an established operation whose level of capacity utilization [is] not affected by the same factors that temporarily affected capacity utilization at [the Texas] facility." *Id.* The ITA also argues that it explained how it determined that the post-treatment costs at Ausimont's Texas facility grossly overstated the value added there by carefully comparing these costs to the costs of Ausimont's "substantially similar" post-treatment operations in Italy. *Id.* at 26,102–04. Wherefore, as the ITA explained,

> In order to reach meaningful conclusions regarding these factors, we must have reliable, objective measures of the value of the imported parts or components and of the value of the finished product that are not distorted by extraneous factors or temporary phenomena. This is especially true in such cases as this. Here, the intermediate product is the sole material input used in the production of the finished product; *thus, any difference between the value of the intermediate product and the value of the finished product will be the result of the processing of the intermediate product into the finished product.*

*Id.* at 26,105 (emphasis added and citation omitted). Hence, the ITA argues that it is the processing that matters, and, because the processing of the polymer into resin at the

Texas and Italian facilities is essentially the same, it was reasonable for it to rely upon the more accurate data from the Italian facility. *Id; Defendant's Memorandum in Opposition,* at 28.

Furthermore, the ITA argues that the statute does not restrict its difference in value determination to a consideration of the costs incurred at a respondent's U.S. facilities. *Defendant's Memorandum in Opposition,* at 33. To the contrary, the statute specifically defines the term "parts or components" contained in the second element of the difference in value calculation with reference to the "parts or components" defined in subparagraph (B)—*i.e.,* "parts or components produced in the foreign country with respect to which such order or finding applies." 19 U.S.C. § 1677j(a)(B). After this language is substituted into subparagraph (C), the difference in value provision requires Commerce to determine that,

> the difference between the value of such merchandise sold in the United States and the value of the imported *parts or components produced in the foreign country with respect to which such order or finding applies is small ...*

19 U.S.C. § 1677j(a)(C) (language substituted from subparagraph (B) is italicized). Thus, the ITA argues that the statute only requires that it determine the difference in the value of the finished product sold in the United States and the value of the imported parts or components produced in the foreign country subject to the antidumping duty order—and says absolutely nothing about costs of production (or any other specific method of determining differences in value). *Defendant's Memorandum in Opposition,* at 34–35.

The ITA argues that equally without merit is Ausimont's claim that it erroneously introduced qualitative factors into its analysis of the difference in value. The ITA argues that the factors enumerated in 19 U.S.C. § 1677j(a)(2) are categorically different than the factors that it applied in its analysis of "value" pursuant to 19 U.S.C. § 1677j(a)(1)(C) in the present case (as well as in its other anti-circumvention proceedings). The factors actually enumerated in paragraph (2)—*i.e.,* "the pattern of trade;"

the relationship between the parties; and whether imports of the precursor parts and components have increased after the issuance of the antidumping duty order—are descriptive of market characteristics, business relationships, and the flow of goods. The ITA argues that these factors provide evidence of circumvention based upon the commercial behavior of the parties and have nothing whatsoever to do with analysis of differences in value. *Id.* at 37–38.

The ITA asserts that the descriptive methodology that it applied to its determination of the value added by the processing operations at Ausimont's Texas facility is based upon an analysis of the process by which finished granular PTFE resin is manufactured. In concluding that the cutting and drying operations at Ausimont's Texas facility constitute only a small portion of this manufacturing process, it (1) developed a thorough understanding of the various steps in the manufacturing process and (2) confirmed its conclusion by comparing the scale and investment required by a facility performing the entire manufacturing process to the scale and investment represented by Ausimont's Texas facility. Plainly, the ITA argues that this is a completely different inquiry than it's investigation into the flow of goods, business relationship, and other market and trade-related factors pursuant to 19 U.S.C. § 1677j(a)(2). *Id,* at 38.

With respect to Ausimont's citation to *Smith Corona Corp., supra,* the ITA argues that this Court did sustain the ITA's determination that it was not appropriate, under the facts of that case, to consider the specific market and trade-related factors enumerated in 19 U.S.C. § 1677j(a)(2) as part of the threshold determination pursuant to 19 U.S.C. § 1677j(a)(1). *Smith Corona Corp.,* 17 CIT at ——, 811 F.Supp. at 694. However, the ITA argues that *Smith Corona Corp.* has nothing to say regarding whether the ITA can determine differences in value pursuant to 19 U.S.C. § 1677j(a)(1)(C) by examining categorically different factors that are indisputably indicative of the value added at Ausimont's U.S. facility. *Defendant's Memorandum in Opposition,* at 38–39 n. 22.

The ITA argues that its use of non-quantitative, descriptive evidence to assess difference in value is completely consistent with its past practice. *Id.* at 40; *see PTFE Final Determination*, 58 Fed.Reg. at 26,108–09 (comment 8). In the *Industrial Forklift Trucks From Japan; Negative Final Determination*, 55 Fed.Reg. 6,028 (1990) ("*Forklifts Final Determination*"), the ITA supplemented its quantitative analysis of "difference in value" with "qualitative" findings that,

> (1) The respondents performed substantial production operations in the United States; (2) the respondents' U.S. facilities included comprehensive assembly operations; (3) the respondents had begun important manufacturing operations in the United States; (4) the respondents made substantial investments in plant and equipment indicative of the magnitude of their U.S. operations; and (5) the respondents' current U.S. operations, their investment in such operations, and the expanding nature of their operations represent substantial U.S. production operations in the United States.

*Forklifts Final Determination*, 55 Fed.Reg. at 6,029. Likewise, in the *PETs Preliminary* investigation, as in the present case, the ITA performed a descriptive analysis of the manufacturing process to determine the total value added by Brother's United States production facilities:

> *Nature of Processing* ... In addition to the purchase of raw material, Brother adds value through assembly, engineering, labor, and quality control. For example, the purchase of a circuit board from a U.S. supplier represents more than the purchase of a plastic board, it also represents Brother's fabrication of the plastic into a component designed to function in a completed PET.
>
> *Our analysis of Brother's manufacturing process is based on Brother's description of its U.S. production processes, and our own observations* .... We observed over 100 different steps in the production process: From parts procurement and preparation, to soldering and welding, to adjustment, inspection, and packing.

*PETs Preliminary*, 56 Fed.Reg. at 46,596 (emphasis added). In *PETs Preliminary*, the ITA concluded that Brother's production workforce and substantial capital investments were further indications of significant production activity in the U.S.

■ At issue in this case, is whether the ITA acted within its lawful discretion when it departed from it's past practice of calculating the difference in value pursuant to 19 U.S.C. § 1677j(a)(1)(C) and relied on a method of analysis that it determined was better suited to the factual situation in this case.

As noted, under 19 U.S.C. § 1677j(a)(1), the prerequisite for an affirmative circumvention finding is that the difference in value between the imported merchandise and the finished product must be *small*. The legislative history denotes that Congress recognized that the facts of circumvention *vary from case to case* and intended that Commerce employ wide discretion in these situations. *See* Senate Report, *supra*.

The administrative record shows that during the period of the anti-circumvention investigation, Ausimont's Texas facility operated under anomalous start-up conditions. The Texas facility operated at [_____] capacity utilization rates. In particular, the administrative record shows that the Texas facility operated at [_____]. As a consequence, the Texas facility suffered losses on its granular PTFE resin sales of approximately [_____] during the period of injury. *PTFE Preliminary—Preliminary Difference-in-Value Analysis Memo*, C.R. Document 14, Fi. 25, at Fr. 60–61.

Furthermore, the conditions under which Ausimont's Texas facility operated were very different from the fact patterns of prior anti-circumvention cases. In those cases, the U.S. facilities producing the finished products were all operating at a profit, and the ITA allocated a proportional share of the profit between the imported merchandise and the finished product to obtain a viable comparison of relative value. *See, e.g., Forklifts Preliminary*, 54 Fed.Reg. at 50,262; *PETs Preliminary*, 56 Fed.Reg. at 46,595. By contrast, the [_____] losses suffered by

Ausimont's Texas facility presented a problem, which precluded the ITA from relying on its past method of quantitative analysis.

The ITA properly addressed these issues in making its difference in value calculation. As noted above, the ITA computed a difference in value figure of 38–55 percent. This difference in value was computed by using the same method of calculation as used in prior anti-circumvention cases involving U.S. finishing operations. After further evaluation of the administrative record, the ITA determined that producing granular PTFE resin from PTFE wet raw polymer "was relatively simple" and that the 38–55 percent figure is "inconsistent" with all available information on the record. As a result, the ITA re-examined its method of calculation and found that it "was distorted in such a way as to provide an artificially inflated measure of the difference in value between the value of PTFE wet raw polymer and granular PTFE resin." *See PTFE Final Determination*, 58 Fed.Reg. at 26,104. As the ITA explained, "[b]ecause of the distorted relationship between cost and price" at Ausimont's Texas facility, "any estimation of the value of the imported product based on a profit or loss calculated using the actual U.S. manufacturing costs would be unreliable." *Id.* at 26,106.

The ITA undertook further analysis of the facts by attempting to isolate the effect of those losses on its results by performing a calculation in which it did not allocate them to the cost of production of the imported product. The results of this calculation further affirmed that the calculation method used in prior anti-circumvention determinations was inappropriate given the different conditions in this case. The ITA stated that "[b]ased upon the magnitude of the difference between the result of this calculation and the 38–55 percent figure we concluded that respondents' losses had a significant impact on our calculation." *Id.* at 26,104.

Due to the aberrant conditions, the ITA requested additional information from Ausimont concerning its U.S. and Italian production facilities. The ITA reviewed the data and determined that the PTFE production processes utilized by both Ausimont facilities

are "substantially similar" and that a comparison of Ausimont's PTFE finishing costs at its U.S. and Italian operations further demonstrates that the 38–55 percent figure is "distorted." *Id.* Hence, the ITA determined that a quantitative analysis using manufacturing costs at the Italian facility would be meaningful based upon complete information that Ausimont submitted regarding the manufacturing process at Ausimont's Italian, Texas, and former New Jersey facilities. *See, e.g., PTFE Final Determination—Final Difference–In–Value Analysis Memo,* C.R. Document 26, Fi. 28, Frs. 84–86. The ITA stated:

> After comparing respondents' descriptions of their post-treatment processes in Italy and the United States, we determined that the processes used in each plant are sufficiently similar to warrant comparison of the two facilities. *Further, while we recognize that respondents produce products in addition to PTFE resin at their Italian facility, we have focused our analysis only on those portions of respondents' Italian operations related to the production of PTFE resin.* Therefore, we believe that a comparison of respondents' U.S. and Italian facilities is appropriate in this case for purposes of evaluating the nature and operating performance of respondents' U.S. operations.

*PTFE Final Determination,* 58 Fed.Reg. at 26,107 (emphasis added).

■ The Court finds that the language in the statute does not restrict the ITA's "difference in value" determination to a consideration of the costs incurred at a respondents' U.S. facilities. Subparagraph (C) of section 1677j(a)(1) requires a determination of whether,

> the difference between the value of such merchandise sold in the United States and the value of the imported parts and components referred to in subparagraph (B) is small. . . .

19 U.S.C. § 1677j(a)(1)(C). The statute only requires that the ITA determine the difference in the *value of the finished product sold in the U.S.* and the *value of the imported parts or components produced in the foreign country* subject to the antidumping order.

There is no statutory language which addresses costs of production or specific methods of determining differences in value. In fact, when the ITA calculates the "value of the merchandise sold in the United States," the parties agree that the ITA uses the "ex-factory" U.S. selling price for the finished product, not costs of production. *See PTFE Final Determination,* 58 Fed.Reg. at 20,202–03; *Plaintiffs' Reply Memorandum,* at 25–26; *Defendant's Memorandum In Opposition,* at 33.

In sum, the ITA fully complied with its obligation to offer a reasoned explanation for not relying upon a calculation that reflects the [_____] losses at Ausimont's Texas facility. Since the administrative record reflects that the processing at the Texas and Italian facilities is essentially the same, it was reasonable for the ITA to rely upon the more accurate data from the Italian facility for its difference in value calculation. Under the given conditions, a difference in value calculation based upon the Texas facility's U.S. costs would have frustrated the intent of Congress in enacting the anti-circumvention provision.

■ With respect to Ausimont's argument that the ITA is prohibited from employing any non-quantitative methods to determine "difference in value" pursuant to 19 U.S.C. § 1677j(a)(1), Ausimont's argument is unpersuasive. The descriptive methodology that the ITA applied to its determination of the value added by the processing operations at Ausimont's Texas facility is based upon an analysis of the process by which finished granular PTFE resin is manufactured. This is a different type of inquiry than that provided for under 19 U.S.C. § 1677j(a)(2). Those factors enumerated under 19 U.S.C. § 1677j(a)(2) provide evidence of circumvention based upon the commercial behavior of the parties and not with the analysis of difference in value.

## Conclusion

■ Congress has given the ITA broad discretion in determining difference in value under 19 U.S.C. § 1677j(a). Accordingly, the ITA may employ varying methodologies as long as such methodologies are reasonable and appropriate under the circumstances. In this case, the ITA fully explained its determination to rely upon further processing costs at the Italian facility, as opposed to the processing costs at the U.S. facility. Furthermore, the ITA grounded its explanation in substantial evidence contained in the administrative record. The Court finds that the ITA's affirmative anti-circumvention determination is reasonable and in accordance with law. For the foregoing reasons, the ITA's final affirmative anti-circumvention determination is sustained in all respects.

## JUDGMENT

This case having been submitted for decision and the Court, after due deliberation, having rendered a decision therein; now, in conformity with that decision, it is hereby

**ORDERED** that plaintiffs' motion is denied; and it is further

**ORDERED** that the ITA's determination in *Granular Polytetrafluoroethylene Resin From Italy; Final Affirmative Determination of Circumvention of Antidumping Duty Order,* 58 Fed.Reg. 26,100 (April 30, 1993) is affirmed; and it is further

**ORDERED** that the action is dismissed.

