**AUSIMONT SPA and Ausimont USA, Plaintiffs–Appellants,**

v.

**UNITED STATES, Defendant–Appellee,**

and

**E.I. DuPont De Nemours, Defendant–Appellee.**

No. 03–1220.

United States Court of Appeals, Federal Circuit.

DECIDED: Feb. 19, 2004.

Rehearing Denied April 15, 2004.

Before LOURIE, SCHALL, and LINN, Circuit Judges.

## DECISION

SCHALL, Circuit Judge.

In this antidumping case, appellants Ausimont SpA and Ausimont USA (collectively, "Ausimont") appeal the decision of the United States Court of International Trade that affirmed the determination of the United States Department of Commerce ("Commerce") that Ausimont's sales of the product wet reactor bead in its home market, Italy, were made within the "ordinary course of trade." *Ausimont SpA v. United States*, 24 Int'l Trade Rep. (BNA) 2225, 2002 WL 31966590 (Ct. Int'l Trade 2002) (*"Ausimont II"*). On appeal, Ausimont contends that because these home market sales were extraordinary, Commerce could not rely on them in the calculation of the dumping margin for Ausimont's U.S. imports of wet reactor bead. We *affirm*.

## DISCUSSION

### I.

The products at issue in this case derive from the chemical polymer polytetrafluoroethylene ("PTFE"). Ausimont challenges consideration of the sales data for an intermediate PTFE product, wet reactor bead, used in the production of granular PTFE resin. In 1988, an antidumping investigation into Ausimont's sales of granular PTFE resin found that the company was dumping its product into the U.S. market. Commerce accordingly issued an antidumping order. *Granular Polytetrafluoroethylene Resin from Italy*, 53 Fed. Reg. 33,163 (Aug. 30, 1988) ("Antidumping Order"). Ausimont, however, circumvented the terms of the order by shipping wet reactor bead into the United States, and then allowing it to be converted domestically into granular PTFE resin. In a 1993 investigation, Commerce concluded that wet reactor bead and granular PTFE resin were the same class or kind of merchandise and that, consequently, the Antidumping Order should apply equally to the importation of wet reactor bead. *Granulation Polytetrafluoroethylene Resin from Italy; Final Affirmative Determination of Circumvention of Antidumping Duty Order*, 58 Fed.Reg. 26,100, 26,101 (Apr. 30, 1993) ("Circumvention Order"). This decision was affirmed by the Court of International Trade in *Ausimont SpA v. United States*, 882 F.Supp. 1087, 19 Ct. Int'l Trade 151 (1995).

An administrative review of the Antidumping Order is the direct subject of this appeal. To calculate an accurate dumping margin for the U.S. sales of all PTFE products during the relevant period, 1996–1997, Commerce compared sales of granular PTFE resin and wet reactor bead, occurring "in usual commercial quantities and in the ordinary course of trade" in the home market, to sales of imports of those products in the United States. 19 U.S.C. § 1677b(a)(1)(B)(i). Thus, Ausimont's wet reactor bead sales in Italy were compared to its wet reactor bead sales in the United States, while its sales of PTFE resin in Italy were compared to its sales of PTFE resin in the United States. Such a comparison to home market conditions should "prevent dumping margins from being based on sales which are not representative...." *Monsanto Co. v. United States*, 698 F.Supp. 275, 12 Ct. Int'l Trade 937, 940 (1988).

In Italy, there were only three sales of wet reactor bead in 1997. Relative to Ausimont's home market sales of PTFE resin in 1997, this amounted to a very small percentage of its total business in Italy that year. In contrast, Ausimont's sales of wet reactor bead in this country comprised nearly half of its total U.S. transactions during the period covered by the administrative review. Despite the variance between the number of sales of wet reactor bead in Italy and the United States, Commerce found that the contested sales of wet reactor bead were sufficiently representative of conditions in the home market. Based on the "normal value" derived from those home market sales, an antidumping margin of 40.90% was set for all PTFE products. *Notice of Final Results of Antidumping Duty Administrative Review: Granular PTFE Resin from Italy*, 63 Fed. Reg. 49,080 (Sept. 14, 1998) ("Final Determination"). Ausimont challenged the Final Determination in the Court of International Trade.

Before the Court of International Trade, Ausimont argued that, had Commerce properly weighed the "totality of the circumstances," in particular, the differences in the volume and value of sales between the two markets, it would have found that the home market sales of wet reactor bead fell outside the ordinary course of trade.

Eventually, the court remanded the case to Commerce for a fuller consideration of Ausimont's position. *Ausimont SpA v. United States*, No. 98–10–03063, slip op. at 51, 2001 WL 1230596 (Ct. Int'l Trade Aug. 2, 2001) (*"Ausimont I"*). On remand, Commerce continued to reject Ausimont's challenges to the methodology and the result of the Final Determination, and again relied on Italian sales of wet reactor bead to calculate the dumping margin for PTFE resin products. *Final Results of Redetermination Pursuant to Court Remand* (Oct. 1, 2001) ("Remand Determination"). The Court of International Trade sustained the results of Commerce's Remand Determination in full. *See Ausimont II*. Ausimont now appeals. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## II.

The statutory standard of review requires the Court of International Trade to "hold unlawful any determination, finding, or conclusion [by Commerce] found ... to be unsupported by substantial evidence on the record or otherwise not in accordance with law...." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). Substantial evidence requires "more than a mere scintilla," *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379, (Fed.Cir.2003) (citation omitted), but the standard is satisfied by "something less than the weight of the evidence." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed.Cir.1984) (citations omitted). Our *de novo* posture requires that we "step[ ] into the shoes of the [Court of International Trade] and duplicat[e] its review" for substantial evidence, *see Allegheny Ludlum Corp. v. United States*, 287 F.3d 1365, 1369 (Fed.Cir.2002) (citations omitted); however, this court will not "ignore the informed opinion of the Court of International Trade." *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 983 (Fed.Cir.1994).

Pursuant to 19 U.S.C. § 1677b(a), to find the correct dumping margin, Commerce must compare the prices at which the subject merchandise is sold in the United States to "normal value," defined as "the price at which the foreign like product is first sold ... for consumption in the exporting country, in the usual commercial quantities and *in the ordinary course of trade* ...." 19 U.S.C. § 1677b(a)(1)(B)(i) (emphasis added). "Ordinary course of trade" is defined in the statute as "the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind." *Id.* § 1677(15); *see also* 19 C.F.R. § 351.102. "Ordinary course of trade is determined on a case-by-case basis by examining all of the relevant facts and circumstances." *Thai Pineapple Pub. Co. v. United States*, 946 F.Supp. 11, 20 Ct. Int'l Trade 1312, 1315 (1996). The traditional factors include (1) volume of sales, (2) frequency of sales, (3) sales price and quantity, (4) profitability, (5) number of customers, (6) market demand, and (7) terms of sales. *Id.* It is within Commerce's discretion to determine how these factors are applied, towards the goal of eliminating non-representative sales. *Id.*

## III.

As noted above, in both the Final Determination and the Remand Determination in response to *Ausimont I*, Commerce found home market sales of wet reactor bead to be within the ordinary course of trade, and thus permissible as a benchmark for comparison to U.S. sales of equivalent merchandise. On appeal, Ausimont raises several contentions. We address them in turn.

### A. *Same Class or Kind*

■ Ausimont first challenges Commerce's determination that wet reactor bead and granular PTFE resin are the same class or kind of merchandise for purposes of the antidumping analysis. It asserts that wet reactor bead is a distinct product not comparable to granular PTFE resin. We are not persuaded by Ausimont's argument. As Commerce found, both in the proceedings below and in the Circumvention Order, wet reactor bead and granular PTFE resin are the same polymer at different stages of processing. The production of granular PTFE resin from wet reactor bead does not distort its fundamental nature; in fact, many of the physical characteristics remain the same. Although granular PTFE resin has additional "end uses" that wet reactor bead does not directly serve, this variation does not propel granular PTFE resin into its own "class or kind" of products. Commerce's finding that PTFE wet reactor bead and granular PTFE resin exist within the same class or kind of merchandise is supported by substantial evidence; we will not disturb it.

### B. *Model for Comparison*

■ To determine if home market sales of wet reactor bead fell within the ordinary course of trade, Commerce compared those sales to sales of the fifty-two models of granular PTFE resin ("individual model approach"). As it did before the Court of International Trade, Ausimont argues that instead the wet reactor bead sales should have been compared to average statistics for all types of granular PTFE resin—an approach frequently employed by Commerce. Again, we are not persuaded by Ausimont's argument. Having considered the record, we have no difficulty accepting Commerce's explanation for its selection of a different model approach in this case.

*See* Remand Determination, at 2–4. In our view, Commerce's use of an individual model approach is supported by substantial evidence and represents a reasonable exercise of Commerce's discretion in conducting an antidumping analysis. *See, e.g. Torrington Co. v. United States*, 68 F.3d 1347, 1351 (Fed.Cir.1995) ("In antidumping cases, we accord substantial deference to Commerce's statutory interpretation, as the International Trade Administration is the 'master' of the antidumping laws." (citation omitted)).

### C. *Ordinary Course of Trade Analysis*

■ Ausimont also challenges Commerce's application of the ordinary course of trade factors. Specifically, it contends that Commerce incorrectly weighed three factors–(1) volume, (2) market demand, and (3) terms and conditions of sales–in arriving at the conclusion that sales of wet reactor bead in Italy were not extraordinary. We do not agree.

First, it was reasonable for Commerce to compare the quantity of wet reactor bead sales to the quantity of sales for *each* granular PTFE resin model. In so doing, Commerce found that only fourteen percent of the granular PTFE resin models were sold in higher volumes than wet reactor bead, whereas eighty percent were actually sold in lower quantities. Because the contested sales of wet reactor bead fell well within the quantity range outlined by the resin models, Commerce appropriately concluded that the volume factor did not support a finding that they were extraordinary. Second, Ausimont challenges Commerce's view that the three sales of wet reactor bead demonstrated market demand. While Ausimont raises a colorable argument that the evidence could be interpreted to support the conclusion of no demand, this fact does not deprive Commerce's contrary finding of its substantial support. It was within Commerce's discretion to view these three sales of above-

average quantity to demonstrate substantial demand for wet reactor bead in the home market. Finally, turning to Ausimont's third contention, while there may be differences between the terms of the wet reactor bead and granular PTFE resin sales agreements, these variations are not so significant that they require the products be considered separately. Thus, we cannot say that it was unreasonable for Commerce to find that this factor also suggested that the contested sales were within the ordinary course of trade.

In sum, we conclude that Commerce's determination that home market sales of wet reactor bead were within the ordinary course of trade is supported by substantial evidence and is free of legal error. Accordingly, we affirm the decision of the Court of International Trade.