Slip Op. 04 - 54

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - - - - x

KISWOK INDUSTRIES PVT. LTD. and     :
CALCUTTA FERROUS LTD.,
                                    :
                    Plaintiffs,
                                    :   Consolidated
            v.                          Court No. 00-06-00280
                                    :
UNITED STATES,
                                    :
                    Defendant.
- - - - - - - - - - - - - - - - - - - x

<u>Memorandum & Order</u>

[Plaintiffs' motion for judgment on the agency
 record granted in part and denied in part; re-
 manded to International Trade Administration.]


                              Decided:  May 20, 2004


     Cameron & Hornbostel LLP (Dennis James, Jr.) for the
plaintiffs.

     Peter D. Keisler, Assistant Attorney General; David M. Cohen,
Director, Commercial Litigation Branch, Civil Division, U.S.
Department of Justice (Lucius B. Lau); and Office of Chief Counsel
for Import Administration, U.S. Department of Commerce (Robert E.
Nielsen), of counsel, for the defendant.


        AQUILINO, Judge:  This case commenced pursuant to 19

U.S.C. §§ 1516a(a)(2)(A)(i)(I) and (B)(iii) and 28 U.S.C. §§ 1581-

(c) and  2631(c) consolidates complaints filed by Calcutta Ferrous

Ltd., CIT No. 00-06-00277, and by Kiswok Industries Pvt. Ltd., CIT

No. 00-06-00280, each praying for relief from <u>Certain Iron-Metal</u>

<u>Castings from India: Final Results of Countervailing Duty Adminis-</u>

<u>trative Review</u>, 65 Fed.Reg. 31,515 (May 18, 2000), promulgated by

the International Trade Administration, U.S. Department of Commerce

("ITA").

        Following the grant of plaintiffs' motion for consoli-

dation, counsel interposed a consent motion to stay this case

pending resolution of a related issue still *sub judice* in Crescent

Foundry Co. v. United States, CIT No. 95-09-01239, and Kajaria Iron

Castings Pvt. Ltd. v. United States, CIT No. 95-09-01240, namely,

> how income received on merchandise not subject to the
> relevant countervailing duty order should be treated when
> calculating benefits from an Indian income tax exemption
> program.

Those matter(s) thereafter finally rested.  See Kajaria Iron Cast-

ings Pvt. Ltd. v. United States, 21 CIT 99, 956 F.Supp. 1023, re-

mand results aff'd, 21 CIT 700, 969 F.Supp. 90 (1997), aff'd in

part, rev'd in part and remanded, 156 F.3d 1163 (Fed.Cir. 1998),

remanded, 23 CIT 13 (1999), second remand results remanded, 24 CIT

134, third remand results remanded, 24 CIT 1274 (2000), fourth

remand results aff'd, 25 CIT ___, Slip Op. 01-5 (Jan. 24, 2001);

and Crescent Foundry Co. v. United States, 20 CIT 1469, 951 F.Supp.

252 (1996), remand results aff'd, 21 CIT 696, 969 F.Supp. 1341

(1997), aff'd in part, rev'd in part, 168 F.3d 1322 (Fed.Cir.

1998), remanded, 23 CIT 12 (1999), second remand results remanded,

24 CIT 141, third remand results remanded, 24 CIT 1278 (2000),

fourth remand results aff'd, 25 CIT ___, Slip Op. 01-6 (Jan. 24,

2001). By its terms, the parties' stay thus expiring, the plain-

tiffs have filed a motion for judgment upon the ITA record pursuant
to USCIT Rule 56.2.

I

All of this litigation, of course, has grown out of
Certain Iron Metal Castings From India: Countervailing Duty Order,
45 Fed.Reg. 68,650 (Oct. 16, 1980).  And, as indicated, this par-
ticular consolidated case focuses on the final results of an ITA
review of imports subject to that order for the calendar year 1997.
Plaintiffs' motion faults those results as follows:

    A.    ITA Did Not Use the Correct Benefit Received
          by Calcutta Ferrous to Determine the Counter-
          vailable  Subsidy  from  India's  Passbook
          Scheme[.]

    B.    Countervailing Preferential Export Financing
          as Well as Income Tax Deductions under Tax
          Code Section 80 HHC Double-Counts the Subsi-
          dies from the Financing Programs[.]

    C.    ITA Failed to Properly Account for Penal In-
          terest Paid by Calcutta Ferrous on Preferen-
          tial Export Loans[.]

    D.    Since Kiswok Was Able to Break down Revenues
          Between Subject and Non-Subject Castings, ITA
          Should Have Calculated the Section 80 HHC
          Subsidy Based on Tax Savings Relating to
          Subject Castings Only[.]

Plaintiffs' Memorandum, p. i (capitalization in original).

A

The ITA's administrative review herein found that the
government of India's "Passbook Scheme" remained in effect for the
first three months of the year at issue.  See Certain Iron-Metal

Castings From India:  Preliminary Results and Partial Recission of

Countervailing Duty Administrative Review, 64 Fed.Reg. 61,592,

61,596 (Nov. 12, 1999).  For that time frame, the scheme

> provided exporters with credits that could be used to pay
> the countervailing and custom duties levied on imported
> products.  [It] was available to certain categories of
> exporters, i.e., those manufacturer and merchant export-
> ers which were granted the status of export house,
> trading house, star trading house, or super star trading
> house.  Upon the export of finished goods, which were
> produced with indigenous raw materials, and not imported
> materials, the exporter was eligible to claim credits
> which could be used to pay customs duties on subsequent
> imports.  The . . . scheme was only applicable for those
> exported products for which standard input/output norms
> had been fixed.  The standard input/output norms set out
> quantities of imported raw materials needed to produce
> one unit of finished output.  The credit in the passbook
> . . . was calculated on the basis of input/output norms
> for the deemed input content of the exported product.
> The Indian Customs Authority (ICA) determined the basic
> customs duty payable against the input as if it had been
> imported and not sourced from the domestic market.  A
> company's passbook account was then credited for the
> amount equivalent to the basic customs duty payable on
> such deemed imports.  The company could then utilize the
> credits in its passbook account to pay the countervailing
> and customs duty levied on imported goods.  Any good
> which was not included in the Negative List of Imports
> could be imported under the Passbook Scheme. Payment of
> the duties was made through a debit entry in the com-
> pany's passbook account by the ICA.

Id.  The agency verified that it was not mandatory for the

> passbook holder to consume the goods, imported with
> passbook credits, in the production of exported products.
> There was no relation between the imported goods and the
> production of the exporter and no relation between the
> standard input/output norms of the export product and the
> goods being imported with passbook credits.  The norms
> were simply used to calculate the credits.  A company
> could not transfer or sell passbook credits received, but
> the goods imported with passbook credits could be
> transferred or sold in the domestic market.

Id.

The record indicates that Calcutta Ferrous Ltd. ("CFL"), a plaintiff at bar, availed itself of this program and also that the ITA determined the scheme was an export subsidy "[b]ecause receipt of the passbook credits was contingent upon export performance"[1] and countervailable because

> a financial contribution was provided by the government in the form of customs duty revenue forgone[, and t]he amount of customs duty which should have been paid by the company to import the goods constitute[d] the benefit . . ..

Id. at 61,596-97.

> To calculate the benefit conferred by this program, we summed the amount of passbook credits each respondent company used during the POR to pay the customs duty on goods imported. We then divided the benefit by each company's f.o.b. value of total exports for 1997.[2]

This approach resulted in a rate of 7.27 percent for CFL[3] that is contested by this plaintiff in several ways.

(1)

CFL contends that the ITA inappropriately relied on 19 C.F.R. §351.519(a)(3)(ii), adopted November 25, 1998, and which provided with regard to identification and measurement of countervailable subsidies:

---

[1] 64 Fed.Reg. at 61,597.

[2] Id. The "we" quoted here and hereinafter refers to the ITA and "POR" to the period of review.

[3] See ibid.

> *Exemption of import charges*. If the Secretary determines that the exemption of import charges upon export confers a benefit, the Secretary normally will consider the amount of the benefit to be the import charges that otherwise would have been paid on the inputs not consumed in the production of the exported product, making normal allowance for waste, and the amount of charges other than import charges covered by the exemption.

Implicit in plaintiff's position are two propositions, namely, that the ITA did in fact rely on this provision, and that the reliance was unfounded. But CFL fails to show how and where on the record the agency so relied. Instead, it states in conclusory fashion that the "ITA initially based its reason for using the unpaid duties as the benefit on 19 C.F.R. §351.519(a)(3)(ii)". Plaintiffs' Memorandum, p. 7. Later, it tempers this assertion with "apparently". See id. at 11. Whatever the choice of words, the record shows that the ITA plainly and repeatedly indicated that it did not rely on section 351.519(a)(3)(ii), *viz*:

> . . . All citations to the Department's regulations reference 19 CFR part 351 (1998), unless otherwise indicated. Because the request for this administrative review was filed before January 1, 1999, the Department's substantive countervailing regulations, which were published in the **Federal Register** on November 25, 1998 (*see* CVD Regulations, 63 FR 65348), do not govern this review.

65 Fed.Reg. at 31,515-16 (bold face in original);

> . . . [U]nless otherwise indicated, all citations to the Department's regulations are to the regulations as codified at 19 CFR Part 351 (1998).

64 Fed.Reg. at 61,593;

. . . We note that the Department's substantive CVD Regulations cited by respondents are not controlling in this review because the request for the review was received prior to the effective date of the new regulations.

ITA Issues and Decision Memorandum ("DecMemo"), PubDoc 94, p. 16, n. 27.

(2)

CFL contends that the ITA inappropriately applied 19 U.S.C. §1677(5)(D)(ii), which defined "financial contribution" to mean a governmental authority's "foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income".  The gist of plaintiff's argument is that the agency failed to find both governmental pecuniary assistance and a benefit as required by 19 U.S.C. §§ 1677(5)(D) and (E).  Cf. Delverde, SRL v. United States, 202 F.3d 1360, 1366 (Fed. Cir. 2000)("the statute clearly requires that in order to find that a person received a subsidy, Commerce [must] determine that that person received from a government both [pecuniary assistance] and benefit").  In particular, CFL insists that the ITA did not make a determination under section 1677(5)(E).  In support thereof, it directs the court's attention to the ITA's lack of reference to that section in its decision memorandum, page 17:

. . . [T]he respondents are incorrect on the valuation of the benefit.  It is irrelevant whether the respondents make a profit on the sale of the imported good.  The financial contribution and benefit provided to the respondents by the government under this program is the amount of duties that otherwise would have been paid on these imports. See section [1677](5)(D)(ii) of the Act.

> Therefore, we calculated the benefit under this program based upon the amount of import duties that would have been paid by the respondents absent the use of credits provided under the Passbook Scheme.

The plaintiff claims that, because only that subsection (5)(D)(ii) is cited, the agency relied on it alone and could not have properly derived any benefit conferred. See Plaintiff's Memorandum, p. 12.

In a case such as this, the court must consider the entire record within the meaning of 19 U.S.C. §1516a(b)(2). E.g., Ausimont USA, Inc. v. United States, 19 CIT 151, 157, 882 F.Supp. 1087, 1092 (1995), citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951). Having now done so, the inference the court draws is that the ITA properly relied on both subsections (5)(D) and (5)(E) in deriving the benefit conferred. Its Preliminary Results state that the amount of customs which should have been paid by the company to import the goods constitutes the benefit under (5)(E) of the Act. 64 Fed.Reg at 61,596-97. At the beginning, the decision memorandum assures that there were no changes in methodology from that used in the Preliminary Results. The agency's Final Results are to the same effect. See 65 Fed.Reg. at 31,515. To the extent the record induces a conflicting inference, "the court will uphold a decision of less-than-ideal clarity if the agency's path may be reasonably discerned". Neenah Foundry Co. v. United States, 25 CIT ___, ___, 142 F.Supp.2d 1008, 1020 (2001), citing Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 595 (1945). In sum, the court cannot find that the ITA's approach was not in accordance with law.

(3)

CFL claims its benefit was the profit earned on the goods it imported and not the amount of duty foregone by the Indian government.  Plaintiffs' Memorandum, p. 11.  The court can concur that the company benefitted from that profit, but this is not to say that it therefore disagrees with the ITA's conclusion.  Indeed, CFL may have benefitted twice under the scheme, first via the exemption from duties and then the profit earned on the goods subject to the exemption.

The question the court must decide is whether the ITA's approach was permissible.  The court concludes that it was consistent with the statute, subparagraph 1677(5)(B) of which states:

> A subsidy is described in this paragraph in the case in which an authority - -
>
> (i) provides a financial contribution,
>
> (ii) provides any form of income or price support within the meaning of Article XVI of the GATT 1994, or
>
> (iii) makes a payment to a funding mechanism to provide a financial contribution, or entrusts or directs a private entity to make a financial contribution, if providing the contribution would normally be vested in the government and the practice does not differ in substance from practices normally followed by governments,
>
> to a person and a benefit is thereby conferred.  For purposes of this paragraph . . . , the term "authority" means a government of a country or any public entity within the territory of the country.

Furthermore, a benefit "shall normally be treated as conferred where there is a benefit to the recipient".[4]  Whatever twists of reasoning this language may permit, they do not negate the agency's determination.

CFL's preferred approach on the other hand, the benefit conferred should be the profit earned, would nullify the intent of the statute in all those instances where recipients of home-government, countervailable benefits still do not turn a profit.  Of course, that intent, unchanged from the law's enactment, has been to compensate for the unfair opportunity to compete that receipt of such benefits entails, not what actually is made of such opportunity:

> . . . This purpose is relatively clear from the face of the statute and is confirmed by the congressional debates:  The countervailing duty was intended to offset the unfair competitive advantage that foreign producers would otherwise enjoy from export subsidies paid by their governments.

Zenith Radio Corp. v. United States, 437 U.S. 443, 455-56 (1978), citing to remarks in the *Congressional Record* by three Senators with regard to the Tariff Act of 1897; Wolff Shoe Co. v. United States, 141 F.3d 1116, 1117 (Fed.Cir. 1998)(countervailing duties "are levied on subsidized imports to offset the unfair competitive advantages created by foreign subsidies").

---

[4] 19 U.S.C. §1677(5)(E). Apparently, the word "normally" was added "only to indicate that in the case of certain types of subsidy programs . . . [none of which are involved here] the use of the benefit-to-the-recipient standard may not be appropriate." H.R. Rep. 103-826(I), p. 109 (1994).

B

According to the ITA's <u>Preliminary Results</u> herein, the

Reserve Bank of India ("RBI"),

> through commercial banks, provides short-term pre-ship-
> ment financing, or "packing credits," to exporters.  Upon
> presentation of a confirmed export order or letter of
> credit, companies may receive pre-shipment loans for
> working capital purposes, *i.e.*, for the purchase of raw
> materials and for packing, warehousing, and transporting
> of export merchandise.  Exporters may also establish pre-
> shipment credit lines upon which they may draw as needed.
> Credit line limits are established by commercial banks,
> based upon a company's creditworthiness and past export
> performance.  Companies that have pre-shipment credit
> lines typically pay interest on a quarterly basis on the
> outstanding balance of the account at the end of each
> period.  In general, packing credits are granted for a
> period of up to 180 days.

> Commercial banks extending export credit to Indian
> companies must, by law, charge interest on this credit at
> rates determined by the RBI.  The rate of interest
> charged on pre-shipment export loans up to 180 days was
> 13.0 percent for the period January 1, 1997 through
> October 21, 1997, and 12.0 percent for the period October
> 22, 1997 through December 31, 1997.  For pre-shipment
> loans not repaid within 180 days, the banks charged
> interest at the following rates for the number of days
> the loans were overdue: 15.0 percent for the period
> January 1, 1997 through October 21, 1997, and 14.0
> percent for the period October 22, 1997 through December
> 31, 1997.  An exporter would lose the concessional in-
> terest rate if the export loan was not repaid within 270
> days. If that occurred, the banks were able to assess
> interest at a non-concessional interest rate above the
> ceiling rate of interest set by the RBI.

64 Fed.Reg. at 61,593.  The agency also found that post-shipment

export financing

> consists of loans in the form of trade bill discounting
> or advances by commercial banks.  The credit covers the
> period from the date of shipment of the goods, to the
> date of realization of export proceeds from the overseas
> customer.  Post-shipment finance, therefore, is a working

capital finance or sales finance against receivables.
The interest amount owed is deducted from the total
amount of the bill at the time of discounting by the
bank.  The exporter's account is then credited for the
rupee equivalent of the net amount.

In general, post-shipment loans are granted for a
period of up to 90 days.  The following interest rates
were charged on post-shipment loans up to 90 days: 13.0
percent for the period January 1, 1997 through June 23,
1997, 12.0 percent for the period June 24, 1997 through
October 21, 1997, and 11.0 percent for the period October
22, 1997 through December 31, 1997.

For loans not repaid within the negotiated number of
days (90 days maximum), banks assessed the following
rates of interest for the number of days the loans were
overdue, up to six months from the date of shipment: 15.0
percent for the period January 1, 1997 through June 23,
1997, 14.0 percent for the period June 24, 1997 through
October 21, 1997, and 13.0 percent for the period October
22, 1997 through December 31, 1997.  If a post-shipment
loan was not repaid within six months of the date of
shipment, an exporter would lose the concessional in-
terest rate on the financing, and interest would be
charged at a commercial rate determined by the banks.

Id. at 61,594.

CFL availed itself of such financing, which the ITA
determined to be an export subsidy because it was contingent upon
export performance and also countervailable because the interest
rates charged were less than what the company otherwise would have
had to pay on comparable short-term loans.  See id.; 65 Fed.Reg. at
31,517.  To calculate the benefit, the agency

compared the actual interest paid on the loans with the
amount of interest that would have been paid at the
benchmark interest rate.  Where the benchmark rate
exceeded the program rates, the difference between those
amounts is the benefit.

> If the . . . loans were received solely to finance exports of subject merchandise to the United States, we divided the benefit derived from those loans by exports of subject merchandise to the United States. For all other . . . loans, we divided the benefit by total exports to all destinations.

64 Fed.Reg. at 61,594.

CFL's complaint now is that the agency "double-counted" the export finance subsidies. Its reliance on Kajaria, supra, in this regard, however, is misplaced. Countervailing a subsidy and countervailing the non-taxation of that subsidy is not countenanced by Kajaria; countervailing a subsidy and countervailing the non-taxation of a different subsidy that incidentally includes a partial benefit via the other is not impermissible. The facts at bar constitute an instance of the latter, not the former, and therefore do not run afoul of that case.

The issue in Kajaria was whether the ITA had double-counted a subsidy by countervailing both a section 80HHC deduction on export profits and some over-rebates resulting from India's Cash Compensatory Support ("CCS") Program. The court held in the affirmative, 156 F.3d at 1173-74. The over-rebates were the result of the agency's finding that certain rebates claimed and received under the CCS program were improper. That program rebated both indirect taxes and import duties imposed on products physically incorporated into an export product. The ITA determined that port and harbor taxes were not the type of taxes and duties falling within the rebate exemption under the CCS; instead, they were

service charges.  The rebate of these non-exempt service charges was countervailable as a subsidy.  <u>See</u> 156 F.3d. at 1168. Concurrently, section 80HHC deductions that included the over-rebates were countervailed by the agency.  <u>See</u> <u>id</u>. at 1167.  Those deductions included the over-rebates because the rebates were exempt from taxation under that tax section.  <u>See</u> <u>id</u>. at 1172, 1174-75.

The plaintiffs in <u>Kajaria</u> argued that countervailing both the CCS over-rebates and the section 80HHC deductions that were based on them double-counted the over-rebates.  The court concurred:

> . . . Countervailing the portion of the section 80HHC deduction attributable to the CCS over-rebates countervails the tax [Kajaria <u>et</u> <u>al</u>.] would have paid on the CCS over-rebates as a result of their inclusion in taxable income.  In effect, Commerce fully countervailed the CCS over-rebates and the tax that would have been paid on the over-rebates.  However, [Kajaria <u>et</u> <u>al</u>.] only received a benefit equal to the full amount of the CCS over-rebates, which Commerce fully countervailed.  Commerce overstated the subsidies received by double-counting the CCS over-rebates.

<u>Id</u>. at 1174-75.

Here, however, the ITA did not attempt to countervail more subsidies than were received.  It countervailed interest saved under the export financing program, and it countervailed taxes saved under the section 80HHC deduction for export profits, two distinct subsidies, each of which benefitted CFL.  That they can be seen to partially overlap via accounting principles is not enough

to render the agency's approach impermissible.  This is because the

ITA is not required to take into account the secondary tax effect

of subsidies, despite the net benefit's being the amount of the

subsidy minus the taxes paid on it:

> . . . Mindful of the burden on Commerce, our decision
> does not mean that in every administrative review or
> investigation Commerce must trace the tax treatment of
> subsidies to determine if two independent subsidies
> partially include the same benefit.  However, Commerce
> must avoid double-counting subsidies, i.e., countervail-
> ing both the full amount of a subsidy and the nontaxation
> of that subsidy . . ..

Id. at 1175.

C

CFL alleges that the ITA failed to account for the

"penal" interest it paid in determining the benefit actually

derived from the preferential financing:

> Where Calcutta Ferrous paid interest on the same
> loan at rates both less than and greater than the
> benchmark rate, all the interest -- including the penal
> interest paid at rates greater than the benchmark rate --
> must be taken into account to determine the actual
> benefit to the company from the loans.  The methodology
> used by ITA, however, improperly eliminates the overdue
> penal interest from the calculation of the benefit from
> the export loans and uses only the preferential interest
> rates.

Plaintiff's Memorandum, p. 21.  The sum and substance of defend-

ant's response to this complaint has been as follows:

> . . . As we explained in the preliminary results, ex-
> porters discount their export bills with Indian commer-
> cial banks to finance their operations.  . . . By dis-
> counting an export bill, the company receives payment
> from the bank in the amount of the export bill, net of

> interest charges.  The loan is considered "paid" once the
> foreign currency proceeds from an export sale are
> received by the bank.  If those proceeds are not paid
> within the negotiated period, then the loan is considered
> "overdue."  For the overdue loan, the bank will charge
> the company interest on the original amount of the loan
> at a higher interest rate[;] however, the bank does not
> go back and levy the higher penalty interest on the
> original term of the loan.  In essence, the overdue loan
> becomes a new loan with a new applicable interest rate.
> Because penalty interest does not apply to the period
> preceding the date the loan is considered overdue, we
> have not taken the penalty interest into account when
> calculating the subsidy provided on the original dis-
> counted loan.

DecMemo, p. 24.  See also Defendant's Memorandum, pp. 21-25.

While that memorandum defends this position as being supported by substantial evidence on the record and otherwise in accordance with law within the meaning of 19 U.S.C. §1516a(b)(1)-(B)(i), the defendant does admit that "Commerce has previously taken penalty interest into account."  Id. at 22, citing Certain Iron-Metal Castings From India; Amended Final Results of Countervailing Duty Administrative Review, 62 Fed.Reg. 590 (Jan. 3, 1997).

> . . . Since that time, however, Commerce reconsidered its
> practice and concluded that adjusting for penalty
> interest did not conform to the requirements of the
> statute, particularly to the net countervailable subsidy,
> offset provision, 19 U.S.C. § 1677(6).

Id., citing Certain Iron-Metal Castings From India; Final Results of Countervailing Duty Administrative Review, 62 Fed.Reg. 32,297 (June 13, 1997).  In that determination, the ITA recited section 1677(6) and proceeded to conclude that penalty interest under

India's Post-Shipment Export Credit in Foreign Currency Program did not fall within that statutory section's exclusive list of allowable offsets.  See 62 Fed.Reg. at 32,305.  This court concurs, but it cannot agree that that offset section, on its face[5], is actually apposite.

Indeed, the ITA's reasoning in this matter, quoted above, makes no mention of that section.  Rather, its "essence" is that "the overdue loan becomes a new loan with a new applicable interest rate."  Nothing on the record, however, supports this thesis, nor should any support be found, given that the loan(s) at issue consisted of a sum certain of money receivable within a specified period of time at a particular rate of interest or thereafter at a greater rate.  Those were the elements of the borrowing, the

---

[5] The full text of this provision is as follows:

     For the purpose of determining the net countervailable subsidy, the [ITA] may subtract from the gross countervailable subsidy the amount of --

     (A) any application fee, deposit, or similar payment paid in order to qualify for, or to receive, the benefit of the countervailable subsidy,

     (B) any loss in the value of the countervailable subsidy resulting from its deferred receipt, if the deferral is mandated by Government order, and

     (C) export taxes, duties, or other charges levied on the export of merchandise to the United States specifically intended to offset the countervailable subsidy received.

benefit of which is not necessarily conclusive upon the close of that specified, initial period.  The duration of the loan, any loan, cannot be disregarded.  It is a critical element of the ulti-mate cost thereof.

D

The section 80HHC of India's Income Tax Act that has been referred to hereinabove enabled exporters to deduct from taxable income profits derived from the export of merchandise.  The record shows that the plaintiffs availed themselves of this deduction, which the ITA countervailed

> because it result[ed] in a financial contribution by the government in the form of tax revenue not collected which also constitute[d] the benefit.

64 Fed.Reg at 61,595.  Its <u>Preliminary Results</u> report in part pertinent to this case:

> In its questionnaire responses, Kiswok Industries . . . stated that its profit rate on export sales of subject castings is lower than the profit rate the company realizes on the export sales of other castings. The company submitted audited derivations of its profit rate for exports of subject castings in 1997, and its profit rate for exports of other castings for the same year.  The company then calculated that portion of the 80 HHC tax deduction which was applicable to export profit earned on subject castings.
>
> In prior reviews of this order, the Department has found the section 80HHC tax deduction program to be an "untied" export subsidy program.  The benefits provided under this program are not tied to the production or sale of a particular product or products.  It is the Depart-ment's consistent and long-standing practice to attribute a benefit from an export subsidy that is not tied to a particular product or market to all products exported by

the company. . . . Therefore, to calculate the benefit Kiswok Industries received under the section 80HHC program, we have not made any adjustments to our standard allocation methodology.

To calculate the benefit each company received under section 80HHC, we subtracted the total amount of income tax the company actually paid during the review period from the amount of tax the company otherwise would have paid had it not claimed a deduction under section 80HHC. We then divided this difference by the f.o.b. value of the company's total exports.

Id., citing Final Affirmative Countervailing Duty Determination: Certain Pasta from Turkey, 61 Fed.Reg. 30,366 (June 14, 1996).

In contesting this approach, the plaintiff Kiswok refers to the opinion of the Court of Appeals for the Federal Circuit in Kajaria, supra, to wit:

. . . [W]hen the party under investigation provides documentation that allows Commerce to separate the portion of the tax deduction based on rebates related to non-subject merchandise from the remainder of a counter-vailable tax deduction, Commerce should not countervail the portion of the tax deduction subsidy tied to non-subject merchandise. Since the Producers provided such data, Commerce should eliminate the . . . rebates from the calculation of the subsidy provided by the section 80 HHC deduction.

156 F.3d at 1176. Whereupon, it argues that this reasoning "applies with equal force to Kiswok's calculations in the case at bar." Plaintiffs' Memorandum, p. 25. This court cannot concur, as countervailing a *subsidy* tied to non-subject merchandise is dif-ferent than countervailing *profit* on non-subject merchandise.

Kajaria *et alia* had challenged the ITA's decision to countervail that portion of a section 80HHC deduction attributable to IPRS rebates (reimbursements to exporters for the difference in price between domestic and foreign pig iron) on non-subject merchandise.  The agency reasoned that the deduction was an untied export subsidy and, in accordance with its policy, allocated the benefit of the subsidy over Kajaria's total exports, which included the non-subject merchandise entitled to IPRS rebates. See 156 F.3d at 1175-76.  The question the court had to answer was "whether the portion of the section 80HHC deduction based on the IPRS rebates was a countervailable subsidy." Id. at 1176.  It answered in the negative, holding that the ITA

> erred in countervailing the portion of the section 80HHC deduction based on the IPRS rebates because the rebates involved were tied to merchandise not within the scope of the review.

Id.  In other words, a subsidy tied to non-subject merchandise--a non-countervailable subsidy--does not become countervailable merely by virtue of its being deductible under a separate, untied countervailable subsidy that is a tax deduction.

This precept does not apply herein.  The Kajaria court was faced with two subsidies: one tied and countervailable, and one tied and not countervailable; and two groups of exports: one subject to investigation and one not.  The record at bar, on the other hand, involves one subsidy, untied and countervailable, and merchandise, some subject to administrative review and some not.

The question thus is whether that non-subject merchandise is of any moment, not, as in Kajaria, whether the countervailing-duty order governed a subsidy tied to non-subject merchandise. On its face, that case is not controlling here, nor does it counsel this court to apply its reasoning by analogy.

Untied subsidies are not linked to any particular merchandise; they are presumed to benefit an exporter in general and are therefore allocated to its total business. See, e.g., British Steel PLC v. United States, 19 CIT 176, 879 F.Supp. 1254 (1995), aff'd in part, rev'd in part and remanded sub nom. LTV Steel Co. v. United States, 174 F.3d 1359 (Fed.Cir. 1999). The presumption is sensible. Money is fungible. A cash subsidy, regardless of its intended or actual use, frees up revenue, which in turn may be applied for other purposes, and thus entails general benefit. See, e.g., Usinor Sacilor v. United States, 19 CIT 711, 893 F.Supp. 1112 (1995), aff'd in part, rev'd in part, 215 F.3d 1350 (Fed.Cir. 1999).

In short, Kiswok is asking this court to reject this longstanding approach of the ITA because profit rates on subject and non-subject merchandise differed. Yet it fails to point to any authority supporting its position. The simple truth of the matter is that the statute does not favor Kiswok's request. Counter-vailing-duty orders are based on the existence of a countervailable

subsidy, 19 U.S.C. §1671(a).  Just as a foreign firm's revenue or expenses do not affect a countervailing-duty order on its subsidized merchandise, the extent to which the exporter profits on that merchandise is irrelevant when it comes to imposition of duties thereunder.

II

In view of the foregoing, plaintiffs' motion for judgment upon the agency record must be, and it hereby is, denied, except that the defendant is directed to recalculate the benefit the plaintiff Calcutta Ferrous Ltd. realized from its preferential loan(s), taking into account all of the interest paid thereon.  The defendant may have until July 9, 2004 to report the results thereof to the court and the plaintiffs, which may then have until July 23, 2004 to comment thereon.

So ordered.

Decided:  New York, New York
          May 20, 2004

                                    Thomas J. Aquilino, Jr.
                                            Judge